HOFLAND & TOMSHECK
JASON F. CARR
Nevada Bar #006587
JasonC@Hoflandlaw.com
JOSHUA TOMSHECK
Nevada Bar #009210
JoshuaT@Hoflandlaw.com
228 S. 4th St., Suite 100
Las Vegas, Nevada 89101
(702) 338-6142

Counsel for **Kristopher Lee Dallmann**

### IN THE UNITED STATES DISTRICT COURT

### DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:22-cr-00030-RFB-01 |
| Plaintiff, | **SUPPLEMENTAL SENTENCING MEMORANDUM** |
| v. | |
| KRISTOPHER LEE DALLMANN, | |
| Defendant. | |

## POINTS AND AUTHORITIES

### A.    Introduction

The defendant, Kristopher Lee Dallmann submits this Memorandum to contest the Presentence Investigations Report's (PSR) proposed sentence.[1]  Mr. Dallman respectfully asks that the Court to impose a sentence of one-year on the misdemeanor counts, 3 and 4,  and a total sentence of thirty-six-months on the felony counts; each count running concurrent to each other. This sentence is reasonable and "adequately reflects the seriousness of the offense, affords adequate deterrence, promotes respect for the law, provides just punishment for the offense, and protects the public."  *See* 18 U.S.C. § 3553(a) and (a) (2) (2024).

The primary focus of this Supplemental Sentencing Memorandum, which should be considered in conjunction with Mr. Dallmann's original sentencing memorandum, a sealed filing that does not have a visible ECF filing number,[2] is to dispute the PSR and government's infringement loss calculations, which are, and this author does not say this lightly, facially absurd.  Nor is the Office of Probation any help in conducting these calculations as that agency has relied solely on the government's facially problematic, and unduly enigmatic, calculations. (*See* PSR at 57, Response to Objection No. 4.)

The Sentencing Guideline calculations proffered by those entities are unresponsive to the actual facts of this case and the business structure at issue.  This yields an untoward, draconian result which should give this Court significant pause.

The fundamental error of the infringement loss calculations is that, in addition to being almost comically speculative, it ignores the business model at issue.  This case does not involve the retail purchase of individual television shows.  At issue is a streaming service that the government alleges failed to acquire the proper reproduction licenses from the actual copyright

---

[1] The final PSR is dated August 14, 2024, and is filed as ECF No. 542.

[2] Mr. Dallmann filed an unopposed request for a clean, complete docket sheet on April 11, 2024.  (*See* ECF No. 677.)

2

holders.  The people who purchased the Jetflicks service are not victims; they received exactly for what they paid.[3]  The victims, to the extent there are any, are the copyright holders, as the government's own filings demonstrate.[4]  The loss at issue is the licensing fee those holders would have received had Jetflicks acquired the right to stream from those entities.[5]  What this amount would have been, if the copyright holders would have even consented, is unknown and undeterminable. What is known is that the government's loss calculations bear almost no resemblance to actual copyright holder losses.

The problem lies in the government's pedantic reliance on the concept of retail value when that concept applies to physical counterfeited items as *United States v. Liu*, 731 F.3d 982 (9th Cir. 2013), the sole case the government relies upon, involved.  Interestingly enough, § 2B5.3, the base offense guideline largely driving the sentencing calculations, explicitly recognizes that its formulas may yield results that "substantially exceed the actual pecuniary harm to the copyright or trademark owner."  U.S. Sentencing Guideline Manual § 2B3.5 app. note 5(c) (2017).  The Commission made this provision for this situation where, as but one example of how far afield the calculations are, the government's proffered infringement amount dwarfs, by a literal order of magnitude, the total gross receipts of Jetflicks over its entire lifespan.

---

[3] As this filing will explore in more detail, there are other erroneous assumptions embedded in the government's calculations that have been rejected by the Ninth Circuit.  For instance, it is improper in the copyright infringement context to assume that retail purchaser of an infringing material would have purchased that material in a different context and at a different price.  *See United States v. Anderson*, 741 F.3d 938, 953-54 (9th Cir. 2013) ("Moreover, the district court did not consider whether purchasers of Anderson's discounted software would have, in fact, purchased full price authentic software if Anderson's software had not been available.").

[4] (*See, e.g.,* ECF No. 570-1 at 2-5 (letter from the MPA).)

[5] As this matter went to trial, Mr. Dallmann does not concede any issues related to substantive guilt and nothing in this Memorandum should be considered a concession of any potential appellate issues.

In fact, the government's infringement amount mode of calculation is infirm. It is this infirmity that led to the inordinately long guideline exposure faced by Mr. Dallman. The Government's Sentencing Memorandum attempts to explain its calculations, but the explanation lacks reliance on case law, data, or expert analysis. (*See* ECF No. 570 at 15-30.) It is also indecipherable. To the extent one can tell what the government is attempting to argue, it appears to be counting the same steaming content over and over again.

Another defect is that the Government's Memorandum voices legally significant *ipse dixit* assertions which assume facts and conclusions that are in contention. (*See, e.g.,* Government Memorandum at 26 (explaining that number of alleged downloads, of which the government does not have copies of, may have been inflated by technical glitches and duplicates, but "they still count as downloads or attempted downloads.").)[6]

Fundamentally, the government's infringement loss theory is untenable. Unlike in the sole case cited by the government, *Liu*, this case does not involve physical copies of copyrighted materials such as CDs or videotapes. Other relevant authority, such as *United States v. Anderson*, 741 F.3d 938 (9th Cir. 2013), undercuts its theory. *See, e.g., Anderson,* 741 F.3d at 1064 ("Although the issue was not raised before the district court, the district court also erred in using the full retail price as opposed to lost profits to calculate the actual loss. Moreover, the district court did not consider whether purchasers of Anderson's discounted software would have, in fact, purchased full price authentic software if Anderson's software had not been available.").)

The government has failed to prove that its Sentencing Guideline calculations are legally valid and failed to meet its burden of proving the amount of copyright holder infringement losses. *See generally United States v. Walter-Eze*, 869 F.3d 891, 912 (9th Cir. 2017) (explaining the government's preponderance of the evidence burden).

---

[6] Nor is it at all clear what relation, if any, the number of downloads from a publicly available site, downloads of unknown material at that, has to copyright violation infringement loss.

Regarding base offense level calculations not related to the alleged infringement loss amounts, the two-level specific offense characteristic Probation applied pursuant to U.S. Sentencing Guideline provision § 2B5.3(b)(3)(A),[7] does not apply based on the pertinent plain language of that provision which requires "the manufacture, importation, or uploading of infringing items." The streaming service at issue, even under the government's theory, did not require the manufacture, importation, or uploading of any item. Essentially, Jetflicks provided links to other services and programs that compiled programs based on internet artifacts after the program was lawfully aired. Neither Jetflicks or the end user was required to manufacture, import, or upload anything. This two-level offense-level characteristic does not apply.

The government claims that uploading was necessary to the operation of Jetflicks. (*See* Government Memorandum at 6-7.) Yet it is unclear from the trial evidence that this was the case. Further, the government's infringement calculations, to the extent they are coherent, appears to rely upon, at least partly, estimates on the number of Jetflicks uploads. Hence, applying a specific offense characteristic for the same conduct that drove another base offense level enhancement constitutes impermissible double counting. *Cf. Untied States v. Joey*, 845 F.3d 1291, 1296 (9th Cir. 2017) ("we have long held that the Sentencing Commission understands double counting—the idea that the same conduct can sometimes result in multiple Guidelines offense level enhancements or adjustments—and expressly forbids it where it is not intended." (citations and internal quotation marks omitted).)

Finally, the MPA's suggestion for attorney fees is inappropriate. First, the MPA was not a litigant in this matter and hence cannot be deemed a prevailing party. Second, there is no itemized attorney bill demonstrating what costs, if any, are directly related to this litigation. Third, there is no way to determine which of the legal fees are permissible costs or consists of fees that are not normally allowed by local rules such as legal research fees. *See* LR 54-11 (providing a list of legal fees that are normally not allowed). Fourth, if the MPA is the victim

---

[7] (*See* PSR at 30, ¶ 147.)

in this case, as it claims to represent all impacted copyright holders, that entity has made no effort to determine its losses.  Instead, it relies on the government's facially invalid loss theory.  Fifth to the extent the MPA assisted the government in its prosecution of this case, those are not allowable losses as the costs of prosecuting a case are not recoverable as restitution.  *See, e.g., United States v. Salcedo-Lopez,* 907 F.2d 97, 98 (9th Cir. 1990) ("The costs of investigating and prosecuting an offense are not direct losses for which restitution may be ordered." (citation omitted)).

### B.    Sentencing Factors in Dispute and Formal PSR Objections

As a prefatory matter, Mr. Dallmann notes that the Office of Probation has created an *ex post facto* issue by utilizing the wrong version of the Sentencing Guideline Manual.  (*Cf.* PSR at 29, ¶ 145.)  The offense conduct at issue was complete by, at the latest, November 2017. The primary guideline at issue, § 2B5.3, was amended in 2018 by Sentencing Guideline Amendment 821.  *See* U.S. Sentencing Guideline Manual Appx. C amend. 821 (effective Nov. 1, 2018).  Hence the 2017 version of Sentencing Guideline is the one utilized in this brief.  *See* U.S. Sentencing Guideline Manual § 1B1.11(b)(1) (2017).

As noted previously, all of Mr. Dallmann's previously filed and voiced sentencing objections are reasserted and incorporated herein.

#### 1.    Factual Corrections

##### a.    The PSR improperly includes references to competitor Darryl Polo's conduct at ¶¶ 103-116.

Mr. Dallmann objects to the PSR's inclusion of allegations from the indictment unproven at trial regarding Darryl Polo being a coconspirator.  (*See* PSR at 22-25, ¶¶ 103-116.) Mr. Dallmann maintains that Polo was a competitor, operating a similar but distinct business, for which Mr. Dallmann cannot be found to be vicariously liable.

### b. The PSR improperly includes factual asserts from the indictment not proven at trial.

Mr. Dallmann objects to the factual recitation of events adopted from the Indictment that were unproven or contradicted at the trial.

### 2. The PSR's Twenty-Two Base Offense Point Increase for an Alleged Infringement Loss of $37,478,436 is Neither Factually nor Legally Correct

Mr. Dallmann objects to the alleged infringement amount of $37,478,436, corresponding to a twenty-two-level (22) increase under United States Sentencing Guideline Manual (U.S.S.G.) § 2B5.3 and § 2B1.1(b)(1)(L). (*See* PSR at 28-30, ¶¶ 136, 137, 147.)

The Sentencing Guidelines set the definition for infringement amount at U.S.S.G. § 2B5.3. This guideline requires that the "retail value" of an infringed item is the retail price of that item in the market in which it is sold. *See* U.S.S.G. § 2B5.3, cmt 2(C) (2017). Where the offense involved the display, performance, publication, reproduction, or distribution of a work being prepared for commercial distribution, the retail value of the infringed item is the value of that item upon its initial commercial distribution. *See id*. § 2B5.3, cmt 2(A)(vi).

Mr. Dallmann objects to the 22-level increase for infringement amount under U.S.S.G § 2B5.3 and § 2B1.1(b)(1)(L). The calculation method is unresponsive to the facts of the case. This case does not involve the physical distribution of counterfeited materials as the guideline appears to be focused. *See also United States v. Liu*, 731 F.3d 982, 998 n.7 (9th Cir. 2013) (affirming, in a brief footnote, calculating the infringement value as the retail value of the counterfeit physical copies of CDs and DVDs found). Attempting to apply the physical copy framework to the facts of this case, involving streaming works online, leads to untenable results.

But before delving into that further, it behooves Mr. Dallmann to point out that this case involves an egregious incidence of the trial tax problem. This is not a trivial concern as Mr. Dallmann's core constitutional rights are at issue.

### a.     The Trial Tax Problem

It is well settled that an accused may not be subjected to more severe punishment simply because he exercised his right to stand trial.  *See, e.g., United States v. Capriola*, 537 F.2d 319, 321 (9th Cir. 1976); *United States v. Stockwell*, 472 F.2d 1186, 1187 (9th Cir. 1973).  In Daryl Polo's case, the government represents his iStreamItAll (ISIA) steaming business possessed bigger library than Netflix, Hulu, Vudu, and Amazon Prime.  Moreover, Mr. Polo, unlike Mr. Dallmann, streamed movies.  The government represented in Polo's signed plea agreement that the infringement amount under § 2B3.5 should be between $250,000 to $500,000.[8]  This calculation was based on the value of Mr. Polo's inventory of infringement materials as found during the execution of search warrants.

Yet for Mr. Dallmann, because he failed to plead guilty, the government devised an entirely new way of calculating infringement value that increased the figure by literally more than a factor of sixty.  This is not a question of normal plea-bargaining concessions such as whether acceptance of responsibility reductions apply or whether the government would bring additional charges.  This is a wholesale reformulation of a previously embraced sentencing theory.  This raises the appearance, if not the specter, of undue retribution and punishment for the exercise of a constitutional right.

The government claims its new method of calculation is based on new data.  (*See* Government Memorandum, at 33.)   This is a hard assertion to evaluate because the government's new method of calculation is inscrutable.  Perhaps this Court can make sense of the government's theory.  Mr. Dallmann cannot. Yet we do know that Mr. Polo was not sentenced until 2021, some four years after the search warrant was executed in this case.  Hence the claim of "new data" is suspect.

---

[8] This information is taken from the investigative letter, dated December 29, 2020, that the Office of Probation relied upon for its infringement amount calculations.  (*See* PSR at 57, Response to Objection 4.)

The danger of undue sentencing disparity is real. The government characterizes both Jetflicks and ISIA in the same manner. Both services are heralded by the prosecution as containing a library greater than any other service on Earth. (*See, e.g.*, Government Memorandum at 16-17.) Both services operated in largely the same manner except that ISIA was more blatant in its copyright infringement by including content that Jetflicks did not such as motion pictures. Hence, it is reasonable to posit that the infringement value for both would fall in the same range. Yet, somehow, Mr. Dallman's infringement loss amount is more than $37,000,000, while Mr. Polo's is less than $500,000.

This Court should estop the government from arguing a different calculation theory that yields different results in similarly situated cases. Simple justice, not to mention the specter of punishing Mr. Dallmann for the exercise of his right to trial, demands that the government not artificially and unlawfully create this unwarranted sentencing disparity. *See also* 18 U.S.C. § 3553(a)(6) (2016) (directed courts to avoid unwarranted sentencing disparity).

**b.    The Government's Retail Value Infringement Theory is Invalid**

There are a number of problems with the government's calculation method, but the core defect is that it has insufficient relation to the facts of this case. This case does not involve selling individual television shows to consumers. This is not the business model at issue. Jetflicks was a streaming service. The government does not attempt to argue, nor could it, that the copyright holders would have received $1.99 per viewed episode. Yet its infringement loss amount assumes this and more.

Not only would the copyright holders receive money per view even for a previously purchased show, but also per download; even when downloads are viewed by no one or are done for technical reasons and computer malfunctions. This is simply not how this works. The government is essentially asking this Court to slavish apply § 2B3.5 in a manner that yields absurd results that have little to no relation to actual copyright holder loss.

Fortunately, the Court need not heed this invitation to error because the law does not support the government's contentions. For instance, in *United States v. Anderson*, 741 F.3d 938 (9th Cir. 2013), although primarily about restitution, the court addressed similar infringement value calculation errors.

Mr. Anderson appealed his conviction for criminal copyright infringement under 17 U.S.C. § 506(a)(1)(A) and 18 U.S.C. § 2319(b)(1). *See Anderson*, 741 F.3d at 941. The case involved Mr. Anderson's unlawful reproduction of physical copies of Adobe software. *See id.* at 941-42. In evaluating Mr. Anderson's challenge to restitution, the court explained some of the pitfalls in determining infringement value. *See id.* at 1063-66.

In reviewing extant case law, the court noted that in cases involving copyright infringement and fraudulent sales, the victim's actual loss typically equates to the profit the victim lost on the sales that were diverted from the victim as a result of the defendant's infringing sales. *Id.* at 1064 (quoting *United States v. Fair*, 699 F.3d 508, 514 (D.C. Cir. 2012)). Under this lost-profits on diverted-sales theory, the government must offer sufficient evidence to establish both the profit margin per sale and the number of sales lost. *Id.* "If the record does not demonstrate that the counterfeit goods ever reached the market, or that their introduction to the market in fact 'thwarted' actual sales of the victim's product, courts have held that no actual loss can be shown and restitution therefore is inappropriate." *Id.*

The *Fair* court also rejected the reliance on lost opportunity sales theory where there "was no evidentiary basis on which the district court could find that had [the defendant's] customers not purchased pirated Adobe software from him at a greatly reduced price, all or any portion of them would have purchased full-priced versions from Adobe." *Id.*

10

The "fact that a consumer purchased an infringing copy at a greatly reduced price is not sufficient, alone, to establish that the consumer would have purchased an authentic copy at full price." *Id*.

The *Anderson* court clarified that the decision was not based solely on restitution law and analysis. While the issue was not raised before the district court, "the district court also erred in using the full retail price as opposed to lost profits to calculate the actual loss." *Id.* at 953. "Moreover, the district court did not consider whether purchasers of Anderson's discounted software would have, in fact, purchased full price authentic software if Anderson's software had not been available." *Id.* at 954. "These are clear and obvious errors because they are inconsistent with the statutory requirements." *Id.*

The government's calculation theories run afoul of the sensible observations set forth in *Anderson*. The government's calculations are based on the idea that each download is worth $1.99, even if never viewed by anyone or if the same episode was downloaded many times due to technical errors. It runs afoul of Anderson's admonishment that a court cannot assume a viewer would have purchased a show for a price greater than that offered by Jetflicks. To make matters worse, the government has no idea what the download quantity attributable to Jetflicks might be so it speculates based on sales puffery and conjecture. It is the government's burden to establish that the victim suffered "an actual loss in a quantifiable amount." *Id*. at 1065. Here the government has failed to prove any copyright holder has suffered any loss. It is their burden. Conjecture and opaque theories based on assumption after assumption will not do.

The problem is twofold. The government's legal theory is ad hoc and impermissible. Further, the government's calculations are based on suppositions, not proof.

For instance, its theory that Jetflicks is responsible for 183,285 television episodes fails because it has not proved that Jetflicks possessed, distributed, or reproduced this number of substantially similar copyrighted television episodes. Proof of infringement requires a fact-based showing, for each piece of alleged infringement, that the purported copyrighted works were "substantially similar" as required to show copyright protection. *See*, *e.g.*, *Metro-Goldwyn-Mayer, Inc. v. American Honda Motor, Inc.*, 900 F. Supp. 1287, 1298 (C.D. Cal. 1995) (applying the intrinsic test, which is a subjective determination, the comparison during the intrinsic test is left for the trier of fact); *Goodson-Todman Enterprises, Ltd. v. Kellogg Co.*, 358 F. Supp. 1245, 1247 (C.D. Cal. 1973) (using intrinsic test in assessing substantial similarity between a TV show and a TV commercial).

Another area of contention is the government claims Jetflicks allowed for downloads of programs by end users; but only sometimes. (*See* Government Memorandum at 17-18.) At what point did Jetflicks allow for downloads? How many programs were in fact downloaded by end users? And this is not the extent of the ponderable inquires. For instance, what are the damages related to each respective copyright holder? What percentage of the customers of Jetflicks, if any, would have paid $1.99 per episode and, if they did, what portion of this fee would be appropriate to the business as opposed to the copyright holder? What is the actual amount of the lost sales, if any? What is the significance of the fact Jetflicks steadfastly only allowed for programs to be streamed after their initial air date?

Many unknowns and questions exist which are properly charged against the government as the party that bears the burden of proof.

The reality is that § 2B3.5 requires the government to prove actual infringement losses to actual copyright holders. *See also* U.S.S.G. § 2B5.3 backg'd (2017) (explaining the sentence for copyright infringement should "reflect the nature and magnitude of the pecuniary harm caused by the crime"). When the Court pulls back the curtain and examines the government's

theory, it will find that, not only has the government failed to prove infringement losses by the required preponderance of the evidence standard, its theories raise more questions than answers.

### c. Statutory Construction Canons Support Mr. Dallmann's Position

Further evidence that the infringement loss calculation is incorrect is found in the fact the government's position leads to an absurd result. "[S]tatutory interpretations which would produce absurd results are to be avoided." *Arizona St. Bd. for Charter Sch. v. U.S. Dep't of Educ.*, 464 F.3d 1003, 1008 (9th Cir. 2006) (internal quotation marks omitted); *see also United States v. Soberanes*, 318 F.3d 959, 963 n.4 (9th Cir. 2003) ("We use traditional canons of statutory construction to interpret the sentencing guidelines."). Further, in the case of interpretive equipoise, courts apply the rule of lenity. *Cf. United States v. Fuentes-Barahona*, 111 F.3d 651 (9th Cir. 1997) (explaining the courts must "infer [the] rationale most favorable to the defendant").

Under the government's theory, the alleged infringement losses to copyright holders are approximately ten times the revenue that Jetflicks received in its entire existence. The government's theory yields a Sentencing Guideline range of 292-365 months; a sentence appropriate for a drug king-pin or murderer. (*Compare* PSR at 50 (relating that JSIN data demonstrates that defendants with a base offense level of 40 and a criminal history category of I received a median sentence of 168 months).) The error is created by the simple fact the government is not focusing on the proper inquiry—what is the value of the actual losses to copyright holders? The government has not even attempted to answer this question.

The government's conceptual corruption has resulted in a computed Sentencing Guideline range that is stunningly severe. It is reasonable to assert that a white-collar offender should not face a Sentencing Guideline range of twenty-five to thirty years for what is essentially a victimless crime; as the government has failed to show any actual victim losses. The Sentencing Commission, to their credit, agrees.

13

The Sentencing Guidelines explicitly recognize that the § 2B3.5 guideline could lead to anomalous, inequitable, results; as it did in this case. Application note 5 to § 2B5.3 provides, in pertinent part that if "the offense level determined under this guideline substantially understates **or overstates** the seriousness of the offense, a departure may be warranted." (emphasis added). The government's theory dramatically increases the sentencing exposure of Mr. Dallmann. This conclusion is reinforced by looking to the calculations utilized for the codefendants, such as Daryl Polo, where the infringement loss is approximately 1.5% of that advanced against Mr. Dallmann despite the fact the government describes Jetflicks and ISIA as being similarly situated.

This Court should accept the directive of the Sentencing Commission and reject the anomalous results produced by § 2B5.3 under the particular facts of this case.

> ### d.   Mr. Dallmann Respectfully Requests a Non-Custodial Sentence

This Court should reject the PSR's offense level calculations. But because there are many objections at issue, there are various final sentencing ranges are possible. For instance, should this Court mirror Mr. Polo guideline calculations, the result is:

14

| Base Offense Level................................... + 8 | U.S.S.G. § 2B5.3(a) |
| Infringement Amount.....................+12 | U.S.S.G. § 2B1.1(b)(G) (loss between $250,000 and 500,000 |
| Commercial Distribution....................+2 | U.S.S.G. § 2B5.3(b)(2) |
| Conviction Under 18 U.S.C. § 1956......+2 | U.S.S.G. § 2S1.1(b)(2)(B) |

**TOTAL ADJUSTED OFFENSE LEVEL** ........................................................................**24**

**CRIMINAL HISTORY CATEGORY**.........................................................................**I**
**(zero criminal history points) (uncontested)**

**SENTENCING TABLE RANGE** ............................................................ **51-63 MONTHS**[9]

      Another possibility involves the objective realization that, while Mr. Dallmann's objections to the twenty-two-point infringement loss calculation objection is robust, his objections to four-point leadership enhancement and the two level §2B3.5(b)(3)(A) characteristic, applied for the uploading of infringing items, are less certain.[10] If the Court applies those enhancements, but applies only a twelve-point infringement amount addition as done in the Polo case, then Mr. Dallman's range becomes:

**TOTAL ADJUSTED OFFENSE LEVEL**.............................................................. **30**

**CRIMINAL HISTORY CATEGORY**............................................................... **I**

**SENTENCING TABLE RANGE**.........................................**97-102 MONTHS**

      Alternatively, if the Court finds that no infringement loss amount is appropriate, a reasonable conclusion given the dearth of proof and lack of clarity in this record, but the Chapter Three leadership and uploading enhancements apply, then the applicable sentencing range is:

---

[9] Mr. Dallmann's original Sentencing Memorandum provided objections to the leadership enhancement under § 3B1.1(a) and to the specific offense characteristic found at § 2B3.5(b)(3)(A). Mr. Dallmann reasserts those objections.

[10] By ranking the relative legal merits of his objections, Mr. Dallmann is not conceding that any of his objections lack merit or should not be sustained.

**TOTAL ADJUSTED OFFENSE LEVEL**............................................................ **18**

**CRIMINAL HISTORY CATEGORY**................................................................ **I**

**SENTENCING TABLE RANGE**.............................................. **27-33 MONTHS**

This is just a sample of the possible permutations. It is striking that the sentencing range depends on outcome of many contested legal and factual issues. Putting all of this aside, Mr. Dallmann respectfully requests this Court consider a probationary sentence.

The reasons for this are narrated and supported in Mr. Dallman's original Sentencing Memorandum. Mr. Dallmann set forth detailed analysis of the failings of the § 2B1.1 loss tables and provided a wealth of mitigating evidence regarding Mr. Dallmann based on his history, characteristics, and life history. The mitigation presented therein is strong. These factors apply with a more certain force when considering the sentence of a first-time felony offender; one convicted of a non-violent offense that, although the jury did not accept the argument, involved unclear and complicated areas of the legal frontier.

Should the Court require a custodial sentence, Mr. Dallmann suggests this Court impose a sentence of three years. Mr. Dallmann respectfully submits that this is a sentence, for all of the reasons presented herein and throughout this litigation, that is sufficient, but not greater than necessary, to meet the sentencing objections set forth in 18 U.S.C. § 3553(a).

**C.    The Motion Picture Association is Not Entitled to Attorney Fees**

Finally, the MPA's request for $43,700 in legal expenses as restitution should be rejected. (*See* ECF No. 570-1 at 4.)

Under the "bedrock principle known as the 'American Rule,' each litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise." *See Marx v. General Revenue Corp*., 568 U.S. 371, 377. 382 (2013); (cleaned up) (quotation citation omitted); *accord MRO Commc'n Inc. v. Tel. & Co*., 197 F.3d 1276, 1281 (9th Cir. 1999)

(explaining that the American Rule recognizes that each party in litigation must bear its own attorney's fees in the absence of a rule, statute, or contract authorizing an award of fees).

It is true that a third party may request legal fees in a criminal case when statutory and other requirements are met. *See, e.g., Untied States v. Eyraud*, 809 F.3d 462, 467-68 (9th Cir. 2015). But, in addition to the aforementioned requirements, the government must prove the amount of loss and causation to support a restitution award by a preponderance of the evidence. *See United States v. Peterson*, 538 F.3d 1064, 1074-75 (9th Cir. 2008). Neither the government nor the MPA have met any of the requirements for an attorney fee restitution award as set forth by statute and local rules. Unless and until that burden is met, this Court should reject any restitution request.

In the case at bar, the statutory structure supporting the restitution request is the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A. (*See* Government Memorandum at 40.) The MVRA requires a district court to "order a defendant to make restitution to a victim of certain specified offenses." *United States v. Anderson*, 741 F.3d 938, 951 (9th Cir. 2013)(citation omitted). The amount of restitution is limited to the victim's "actual losses" that are a direct and proximate result of the defendant's offense. *United States v. Hunter*, 618 F.3d 1062, 1064 (9th Cir. 2010).

The MVRA allows for restitution recovery for certain enumerates offenses. The conceivable basis for a restitution award in this case requires that this Court identify a "victim or victims" that have "suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1)(B) (2024). Given violence is not at issue, to acquire restitution, the MPA must prove that is suffered a pecuniary loss.

The MPA request falls short of this requirement. It has not identified any individual member who has suffered any pecuniary loss. It is, quite simply, not a victim.

But then there is § 3663(b)(4) which allows a restitution award "in any case," to reimburse "the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or

attendance at proceedings related to the offense." This provision, however, is read narrowly and cannot include expenses incurred by a private party that are not directly related to the criminal investigation. *See Lagos v. United States*, 584 U.S. 577, 583-84 (2019).

Therefore, even if the MPA can be considered a proxy victim, that association, like General Electric, the company at issue in *Lagos*, is not entitled to reimbursement for private investigative work that is not directly related to the attendance at a criminal trial or investigation. Nor, given *Lagos*' narrow reading of this exact provision, is the government entitled to foist legal investigative work onto the MPA in order to assist it in preparing for trial.

This isn't an incidental amount of time where the cost may be allowed. For example, there may be a claim for a worker's time to travel and testify if that witness was necessary to a case. Here, however, the government is claiming 143 attorney hours. For what purpose? The government admits the hours of attorney time were expended to prepare for criminal litigation. (*See* Government Memorandum at 41.) This fact alone bars the claim. The government cannot, either directly or by proxy, recover the costs it expends in investigating and prosecuting criminal cases. *See United States v. Vaughn*, 636 F.2d 921, 923 (4th Cir. 1980) (finding it improper to order restitution of the costs of investigating the defendant's case); *cf. United States v. Kenney*, 789 F.2d 783, 784, 790 F.2d 85 (9th Cir. 1986).

There are also proof problems. While the MPA claims to have expended legal hours on this matter, it has not submitted supporting documentation. Hence not only has the government failed to prove a direct and enumerated pecuniary loss, it has not substantiated how and why the MPA's legal fees are relevant to this matter. It is a relatively simple matter to submit an itemized attorney fee bill.

Nor, without a bill, is it possible to assess the reasonableness and appropriateness of awarding legal fees. The party seeking attorneys' fees bears the burden of proving reasonableness of the award. *See Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983). This is done by establishing their entitlement to an award and the amount to which they are entitled. The starting point for fee calculations is the number of hours reasonably expended on the litigation

multiplied by a reasonable hourly rate. *See id.* at 433. This figure, known as the lodestar, is presumed an appropriate fee when the number of hours and the claimed rate are proved reasonable. *See City of Burlington v. Dague*, 505 U.S. 557, 560 (1992); *Blum v. Stenson*, 465 U.S. 886, 897 (1984).

Further, there are factors specific to the District of Nevada as set forth in Local Rule 54-14. This Rule states that a motion for attorney's fees must contain a "brief summary of:"

> (A) The results obtained and the amount involved;
> (B) The time and labor required;
> (C) The novelty and difficulty of the questions involved;
> (D) The skill requisite to perform the legal service properly;
> (E) The preclusion of other employment by the attorney due to acceptance of the case;
> (F) The customary fee;
> (G) Whether the fee is fixed or contingent;
> (H) The time limitations imposed by the client or the circumstances;
> (I) The experience, reputation, and ability of the attorney(s);
> (J) The undesirability of the case, if any;
> (K) The nature and length of the professional relationship with the client;
> (L) Awards in similar cases; and
> (M) Any other information the court may request.

Mr. Dallmann respectfully submits that the government's brief justification of the MPA's request fails to satisfy the disclosure and proof requirements necessary to support an attorney fees award. Admittedly, this is a different context than civil litigation. But that is not a reason to dispense with the requirements that exist to ensure an attorney's fee request is reasonable, justified, and substantially related to the positions and arguments that prevailed in the relevant litigation.

## CONCLUSION

The instant case is an unusual one with rarified legal issues. The primary issue of contention is the infringement loss amount. Mr. Dallmann submits the figure should be zero or, at worst, be valued at between $250,000 and $500,000 based on the value of the infringement material inventory. This is how the government agreed to set Mr. Polo's sentencing range. The

same mode of analysis should apply here as it is beyond peradventure that a defendant cannot be punished for exercising the constitutional right to proceed to trial.

Yet this what is at issue here—a trial tax. And not a trivial one. The government's change in calculation formula increased the amount of infringement loss by sixty-fold. This deprivation of individual rights and liberty cannot, and should not, be countenanced.

Sentencing Guideline range aside, in the end, the sentence this Court imposes must reflect all of the § 3553(a) sentencing factors. Given Mr. Dallmann's history and characteristics, which a host of mitigating factors as previously briefed under seal, a probationary sentence is warranted in this matter. If incarceration is deemed necessary by this Court, Mr. Dallmann respectfully asks this Court to consider a three-year sentence.

DATED this 22nd day of May, 2025.

RESPECTFULLY SUBMITTED,

**HOFLAND & TOMSHECK**

By:     **_/s/ Josh Tomsheck._**
JOSH TOMSHECK. ESQ.
State Bar of Nevada No. 09210

**_/s/ Jason F. Carr_**
JASON F. CARR, ESQ.
State Bar of Nevada No. 06587

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on May 22, 2025, I served the forgoing **SUPPLEMENTAL SENTENCING MEMORANDUM** via electronic service which will reach counsel for all interested parties in this matter.

Defendant Kristopher Lee Dallmann will not be served with this Memorandum by electronic service. The undersigned will ensure Mr. Dallmann receives a copy of this brief shortly after filing.


By: */s/ **Jason F. Carr***
Jason F. Carr
Hofland & Tomsheck